**AFFIRM; and Opinion Filed November 19, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01313-CV

**INSURANCE ALLIANCE, Appellant/Cross-Appellee**
**V.**
**LAKE TEXOMA HIGHPORT, LLC, Appellee/Cross-Appellant**
**AND**
**BOWOOD PARTNERS, LIMITED, Appellee/Cross-Appellee**

**On Appeal from the 397th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 08-0604-397**

## OPINION

Before Justices Bridges, O'Neill, and Brown
Opinion by Justice Brown

After its marina on Lake Texoma was damaged in a flood, Lake Texoma Highport, LLC sued its insurance broker, Insurance Alliance, and a London broker, Bowood Partners, Limited, because the policy in place at the time of the flood was not the policy Highport had requested. A jury returned a verdict in Highport's favor. The trial court's judgment ordered that Highport recover damages and attorney's fees from Insurance Alliance for breach of contract, that Highport take nothing on its claims against Bowood, and that Insurance Alliance take nothing on cross claims it asserted against Bowood.

In this appeal, Insurance Alliance contends there is no evidence to support the jury's findings on Highport's damages and also challenges the attorney's fee award. Insurance Alliance further contends the jury's finding that Bowood did not violate the insurance code is

contrary to the conclusive evidence and that the court should have submitted other theories of Bowood's liability to the jury. In a cross-point, Highport contends that in addition to its judgment against Insurance Alliance for breach of contract, it was entitled to recover 10% of its damages from Bowood on a tort theory. For reasons that follow, we affirm the trial court's judgment.

## BACKGROUND

Highport owns and operates a large marina located on Lake Texoma. The property includes many boat docks, a service center, a fuel station, an administration building, and multiple restaurants and bars. In 2005, Highport hired Insurance Alliance to perform a risk assessment on Highport's property. After doing so, Insurance Alliance recommended that Highport get blanket insurance coverage, where one limit covers all losses, with no coinsurance penalties or sublimits and with replacement-cost coverage. Highport hired Insurance Alliance to obtain the recommended coverage for 2005 and again for 2006. In 2007, Insurance Alliance acted as Highport's broker again, and Highport sought $15 million blanket coverage for the policy period of March 31, 2007 to March 31, 2008. Several entities were involved in procuring the insurance policy. The insurance carrier was Lloyd's of London. Insurance Alliance used CRC Insurance Services Inc. as a middle broker. CRC's sister company Southern Cross hired Bowood, a London broker, to deal directly with Lloyd's.

In June 2007, during Highport's busy season, a flood damaged the marina, leaving some of its buildings completely submerged. It was several months before the flood waters receded. Pompanos Restaurant, a Highport destination for dining and nightlife, was destroyed in the flood, as were the Clipper Bar and the Waterfront Club.

In the months after the flood, Highport learned it did not have the $15 million blanket coverage it asked Insurance Alliance to get and thought it had. Instead, the marina was covered

by a $15 million policy that had sublimits and coinsurance penalties.[1]  In November 2007, the loss had not been resolved, so Highport borrowed money to demolish and rebuild Pompanos Restaurant, which reopened as the Island Bar and Grill in May 2009.

In April 2008, Highport filed suit against Insurance Alliance and Lloyd's in state district court in Grayson County.  Lloyd's removed the case to federal court, claiming the federal court had jurisdiction because the policy contained an arbitration agreement and Lloyd's is not a United States citizen.  *See* 9 U.S.C.A. §§ 201–205 (West 2014) (Convention on the Recognition and Enforcement of Foreign Arbitral Awards).  In federal court, Insurance Alliance filed a third-party complaint against Bowood and CRC, alleging they were liable to it for violations of the deceptive trade practices act and insurance code, as well as for breach of warranty.  Thereafter, Highport amended its pleadings to add Bowood and CRC as defendants.  In June 2009, Highport settled with Lloyd's for $6.7 million, after which the federal court granted Highport's motion to dismiss its claims against Lloyd's with prejudice.  CRC then moved to compel arbitration based on an arbitration provision in the brokerage agreement between it and Insurance Alliance.  In January 2010, the federal court granted CRC's motion and stayed Highport's claims against CRC.  In June 2010, upon agreed motion of the parties, the federal court remanded the case to the state district court.  Highport and CRC agreed to hold the arbitration in abeyance until the conclusion of the trial in Grayson County.

Highport's operative pleading asserted various causes of action against Insurance Alliance and Bowood, including breach of contract, fraud, conspiracy, violations of the DTPA, and negligence.  Highport's claims against these two defendants, and Insurance Alliance claims against Bowood, went to trial before a jury in April 2012.  Insurance Alliance's CEO admitted at

---

[1] One of Highport's witnesses, an Insurance Alliance employee, explained coinsurance as follows:  "[I]f there was an 80 percent co-insurance you have to ensure [sic] that property for at least 80 percent of what it would cost to replace that.  If you don't meet the 80 percent requirement then there is a penalty involved in the event of a loss."

trial that "something went wrong" in the process of securing Highport's policy and that his company bore some responsibility for the fact that Highport did not have the policy it wanted. But Insurance Alliance also claimed that Bowood made unauthorized changes to the terms of the policy. Specifically, a Bowood employee used information in the application prepared by Insurance Alliance and information Southern Cross provided about Highport's property values to create a document called the "Bowood Underwriting Submission," which contained detailed property schedules. Bowood presented the Bowood Underwriting Submission, not the application documents, to the underwriters to request insurance for Highport. Bowood in turn claimed that the insurance application documents Insurance Alliance prepared and provided to CRC, which were ultimately passed on to Bowood, were incomplete and inaccurate. Both Insurance Alliance and Bowood blamed CRC for failing to communicate to Insurance Alliance that the policy obtained did not provide blanket coverage when CRC knew that was what Highport sought.

After a three-week trial, the jury found that Insurance Alliance agreed to procure for Highport an insurance policy with $15 million in blanket coverage, with no sublimits and no coinsurance and with replacement-cost coverage, and that Insurance Alliance failed to comply with that agreement. It further found that Insurance Alliance, Bowood, CRC, and Lloyd's were negligent. The jury also found that Insurance Alliance and CRC, but not Bowood, made negligent misrepresentations and engaged in an unfair or deceptive act or practice that was a producing cause of damages to Highport. The jury also made the following proportionate responsibility findings: Insurance Alliance was 45% responsible for Highport's injury, CRC was 40% responsible, Bowood was 10% responsible, and Lloyd's was 5% responsible.

In Question 15, the jury was asked to determine Highport's damages. The jury was specifically asked to determine the amount of coverage that would have been available under the

–4–

*policy sought* to repair and/or replace property damaged in the flood, less the amount of coverage that was provided by the *policy obtained*. The jury's answer to this question was $8.3 million. It also determined that the amount of coverage available to reimburse Highport's business interruption damages under the policy sought, less the amount of coverage available under the policy obtained, was $438,598. The jury further found that Highport's reasonable attorney's fees for representation in its claims against Insurance Alliance in the trial court were $2,754,446, with additional amounts for representation on appeal.

After the verdict, Highport filed a "Motion to Sign Judgment," in which it sought to recover on its breach of contract theory against Insurance Alliance and on its negligence theory against Bowood. An attached proposed judgment sought to recover 100% of the damages from Insurance Alliance and 10% from Bowood. At a hearing on the motion, the trial court indicated that if Highport elected to recover from Insurance Alliance on the contract, it was not entitled to recover against Bowood. Highport objected to being forced to elect. The trial court then stated that it would order judgment on Highport's breach of contract claim against Insurance Alliance because that claim afforded Highport the highest recovery.

The court subsequently rendered judgment for Highport on its breach of contract claim against Insurance Alliance. The court ordered that Highport recover from Insurance Alliance $8,738,598, plus court costs, pre- and post-judgment interest, and attorney's fees. The court rendered a take-nothing judgment on Highport's claims against Bowood and on Insurance Alliance's claims against Bowood. The judgment severed Highport's claims against CRC. This appeal followed.

## DAMAGES

In its first issue, Insurance Alliance contends there is no evidence to support the jury's answers to Question 15 on Highport's property and business interruption damages. The jury was

asked to answer Question 15 if it had answered "Yes" to any of the various liability questions.

Question 15 provided:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Highport for its damages, if any, that resulted from such conduct?
>
> . . . .
>
> Consider the following elements of damages, if any, and none other.
>
> Answer separately in dollars and cents for damages, if any.
>
> a.      The amount of coverage that would have been available under the 2007 policy sought by Highport to repair and/or replace the overwater electrical system damages in the flood, less the amount of coverage that was provided by the 2007 policy actually obtained.
>
> > Answer:      0
>
> b.      The amount of coverage that would have been available under the 2007 policy sought by Highport to repair and/or replace the property damaged in the flood, other than the overwater electrical system, less the amount of coverage that was provided by the 2007 policy actually obtained.
>
> > Answer:      8,300,000.00
>
> c.      The amount of coverage that would have been available to reimburse Highport's Business Interruption damages resulting from the flood under the 2007 policy sought by Highport, less the amount of coverage that was provided by the 2007 policy actually obtained.
>
> > Answer:      438,598.00

Insurance Alliance contends there is no evidence to support the jury's answers to 15(b) and (c).

We measure the evidence of damages by the charge given to the jury. *McGinty v. Hennen*, 372 S.W.3d 625, 628 (Tex. 2012) (per curiam). On an issue where the opposing party bears the burden of proof, we sustain a legal sufficiency challenge to an adverse finding if our review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla. *Burbage v. Burbage*, No. 12-0563, 2014 WL 4252274, at *8 (Tex. Aug. 29, 2014); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach

–6–

different conclusions. *Burbage*, 2014 WL 4252274, at \*8. Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Id.*; *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009). We consider the evidence in the light most favorable to the judgment, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Burbage,* 2014 WL 4252274, at \*8 (quoting *City of Keller*, 168 S.W.3d at 807). The jury generally has broad latitude in determining damages. *Id.* at \*9.

### a. Property Damages

Insurance Alliance first contends there is no evidence to support the award of $8.3 million in property damages for two reasons: 1) there is no evidence of the amount of coverage the *policy obtained* provided for the losses at the marina, and 2) there is no evidence of the amount of coverage that the *policy requested* would have provided. We begin with Insurance Alliance's assertion that there is no evidence of the amount of money Highport was entitled to for property damage under the policy it actually had from Lloyd's.

Jon McNaught, an attorney Highport hired in June 2007 to assist with documentation of its insurance claim, testified for Highport. On July 19, 2007, Insurance Alliance sent Highport an email informing it that although it had a policy with a $15 million limit, the policy had sublimits, including a sublimit of $4,075,000 for property damage. Attached to the email was a copy of a policy page referencing the limits for five categories: Piers/Docks ($12,806,756), Property ($4,075,000), Equipment ($125,350), Business Interruption ($4,000,000), and Contents ($1,375,000). According to McNaught, this was "a huge erosion of the coverage" he thought Highport had in place. About a week later, Insurance Alliance emailed Highport and attached the "2007-2008 Lloyd's of London Property Policy." McNaught reviewed this document and confirmed that the policy appeared to have a sublimit of $4,075,000 for dry property. McNaught

later learned of a "further erosion of the policy." Specifically, Highport's property coverage was going to be reduced from $4,075,000 because Highport did not have replacement-cost coverage, but instead would be paid for "a diminished or depreciated value" due to coinsurance penalties. The only way to move forward on the claim was for Highport to allow a valuation, which it ultimately agreed to do. Highport focused its claim documentation on the dry property and tried to get that claim prepared and submitted to the carrier for reimbursement. In late November 2007, Highport filed with Lloyd's a "Partial Proof of Loss" for $8,291,598.48. McNaught testified he was told this document had to be submitted in order for Highport to receive a partial payment on its business interruption claim.

In December, McNaught asked Insurance Alliance's CEO to provide "a full 'certified' copy of the policy and all of its attachments." McNaught testified that he made this request because every time Highport asked for a set of policy documents, they changed. In late December 2007, McNaught received a cover note dated May 9, 2007. The first time a Lloyd's signed policy was issued in this case was in June 2011. There was evidence that when insured by Lloyd's, the insured rarely gets a policy; instead it gets a cover note or a slip evidencing insurance. The cover note or slip is never issued by Lloyd's; it is issued by the Lloyd's broker. All of the policy documents up until 2011 were prepared and issued by Bowood.

Two months after it filed its Partial Proof of Loss, Highport had not received written acceptance or denial of its claim. On February 1, 2008, McNaught sent an email to a Texas lawyer representing Lloyd's and to a representative of Lloyd's adjustor, and copied an Insurance Alliance representative. In the email, McNaught listed the scheduled values for various property, which correspond to those in the Bowood Underwriting Submission, including the administration building, the Clipper Bar, and an unnamed restaurant. He stated that, "The above referenced scheduled values, in the light most favorable to your clients, represent undisputed amounts owed

to Highport of $2,915,000." (McNaught did not seek the full scheduled value for the administration building.) McNaught requested, on behalf of Highport, that "your clients make a good faith payment to Highport of the undisputed amounts owed." McNaught explained at trial that he did this to get some money flowing. He was trying to find undisputed amounts that could be paid to Highport. According to McNaught, at the time of his email in February 2008, Insurance Alliance, Bowood, and Lloyd's all agreed that the policy had coinsurance and sublimits.

When asked at trial if the $2.9 million figure was his analysis of the maximum amount that could be paid under the actual policy issued, McNaught responded, "That was my sense of at or near the maximum recoverable value under the policy with all of those limitations as they had been presented." He also said, "I'm not a hundred percent sure that every single category, like contents, was in there but it would have been a number really close to that." McNaught explained that this amount was for property and did not include business interruption or electrical. He further explained the number represented the "best amount we could seek to get under the policy as explained." No money was paid to Highport as a result of McNaught's email, and Highport filed suit.

One reason Insurance Alliance maintains that Highport's evidence of what it was entitled to under the policy it had fails is because Highport never requested a coverage determination from the trial court. Insurance Alliance asserts that given the "seventeen different policy versions furnished by Bowood," Highport should have asked the trial court to determine what coverage it had, because it was a legal question for the court. As a result, Insurance Alliance argues, the jury had no way to calculate the amount Highport was entitled to under the Lloyd's policy.

In support of its argument that Highport was required to get a coverage finding from the trial court, Insurance Alliance cites one summary judgment case, stating that the insured has the burden of establishing coverage under the terms of the policy and discussing general rules courts use in interpreting policies. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124–26 (Tex. 2010). We are not persuaded that Highport had any procedural responsibility or other obligation to ask the court for a coverage determination. Further, Highport's coverage could not be determined by the court as a matter of law. There was conflicting evidence about the content of the policy issued. For example, Bowood employee Mark Shepherd testified the Bowood Underwriting Submission, and its detailed schedule of property values, became part of the policy, while former Insurance Alliance employee Doyle Fletcher and Highport's expert Ronald Hendy testified it was not part of the policy. Under the facts of this case, where the parties disputed what terms were part of the policy, we cannot say that Highport's failure to ask the court for a coverage determination means the evidence is insufficient to support the damages awarded. We presume the jury resolved any questions about Highport's coverage when it made its damage findings.

Insurance Alliance also contends expert testimony was necessary to calculate the money owed under the policy obtained. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006) ("Expert testimony is required when an issue involves matters beyond jurors' common understanding.") McNaught, the attorney hired by Highport to be the "point person" for the documentation of its insurance claim, testified he had some experience in procuring insurance in his work as general counsel for various people. During McNaught's testimony about coverage under the policy, Insurance Alliance objected on grounds that he had not been designated and was not qualified as an expert on policy benefits. The court overruled the objection, reasoning that it was going to let McNaught explain his email. Outside the presence of the jury, the trial

court noted that it did not allow McNaught to testify as an expert. On cross-examination, Insurance Alliance's trial counsel asked McNaught if he was an "expert," meaning if he was qualified to read the policy and tell Highport what it was entitled to.[2] McNaught indicated that he considered himself an expert in that regard and testified that he was qualified to determine the coverage Highport had under the policy in place. Even if expert testimony was needed regarding the amount of coverage provided by the policy, McNaught testified that he was an expert, and the jury was never told to limit its consideration of his testimony in any way.

Insurance Alliance contends McNaught's email was only about dry property, such as buildings, and did not include any amounts Highport was entitled to under the policy for wet property damage, such as piers and docks. While his email does refer to dry property, McNaught's testimony at trial did not contain such a limitation. McNaught testified that $2.9 million was "at or near" the maximum amount Highport could recover under the policy issued. He also testified that $4,075,000 was the limit on property damage under the policy. We conclude McNaught's testimony was competent evidence, and more than a scintilla of evidence, of the property coverage Highport had under the policy in place.

Insurance Alliance next contends that there was no evidence of the amount of coverage that the policy *sought* would have provided for Highport's losses. It asserts there is no evidence that the policy would have paid its full $15 million limit. According to Insurance Alliance, because the marina buildings were not capable of being repaired, under the policy requested they had to be replaced with buildings of "like kind and quality." Insurance Alliance maintains there is no evidence the Island Bar and Grill, and the other planned replacement buildings, were of "like kind and quality" or that the cost to rebuild them was reasonable.

---

[2] Before trial, Insurance Alliance moved to exclude testimony from two of Highport's experts, David Hann and Ronald Hendy, regarding the amount of coverage the policy obtained provided on grounds that their opinions in that regard were first disclosed after the deadline for discovery. The trial court agreed and refused to allow the testimony.

Highport's adjustor, Adjusters International, initially presented an estimate of Highport's repair costs in the amount of $8,975,656.49. David Hann, a public insurance adjuster who reviewed the documents and bids in this case, testified that the 2007 estimate was a partial preliminary estimate based on the information available at that time. In 2012, Hann issued a supplemental opinion regarding damages. His estimate of Highport's total damages before legal fees was $15,940,456.48.

Hann explained that there were two reasons for the increase in the damage estimate. First, the $8.9 million estimate was a repair estimate because the initial opinion by Adjustors International was that the buildings appeared to be structurally sound and needed only cosmetic repairs. It was eventually determined that three of the buildings (Pompanos, the Clipper Bar, and the Waterfront Club) were a total loss and needed to be replaced. (By the time of trial, Pompanos had been rebuilt as the Island Bar and Grill, but other buildings had not been replaced.) Second, Adjustors International's original estimate was based on its understanding of costs using estimating software. By the time Hann became involved, the Island Bar and Grill had been rebuilt. The actual costs of that rebuild were used to estimate the costs of rebuilding the other buildings, yielding more accurate numbers. Deducting Highport's business interruption damages and the cost of the overwater electrical system (which were submitted to the jury in separate questions) from Highport's total damages before legal fees of $15,940,456.48, leaves an amount of $11,220,858.40.

Highport also called Scott Bates, owner of Ceci Bates Commercial, as a witness. Bates was responsible for demolition of Pompanos and construction of the new restaurant in its place. After the flood subsided, according to Bates, it was a "foregone conclusion there wasn't anything to use left there." Bates provided an estimate for repair and rebuild of all the damage to the marina caused by the flood. Before consulting and legal fees, Bates's estimate of the marina's

damages was $18,010,393.43, which included about $3.4 million for overwater electrical work. Deducting that amount leaves a balance of $14,610,393.

Bates testified about the similarities and differences between Pompanos and the Island Bar and Grill. Pompanos was twenty to twenty-five years old at the time of the flood. Bates testified that the old restaurant and the new restaurant have the same function. Bates did not prepare a bid to replace Pompanos exactly as it was before the flood. He explained that it would have cost "way too much money to build it back that way." He described changes made in the design of the restaurant to reduce costs. For example, Pompanos had a floating kitchen, but the new restaurant does not because that kind of kitchen costs "way too much money." Also, the new restaurant has glass garage doors rather than solid walls. Further, the kitchen in the Island Bar and Grill is considerably smaller, and the HVAC system has much less capacity than the old system. Bates testified that by making changes to the original design of Pompanos, Highport saved over half of the building costs. Bates testified that the new restaurant was of "like kind" to the old restaurant. He further testified that based on the bids he put together for reconstruction of the other buildings, those structures were to be "like kind" with the buildings that were there previously. His plans were to build back everything that was there before the flood, but not more than was there before. No additional restaurants or bars were planned. There was no increase in the size or functionality or the number of buildings compared to what was there before.

The jury heard a great deal of testimony about the design features and materials used in the Island Bar and Grill and how they were the same or different in nature and quality from the restaurant it replaced. While some individual elements were more expensive than the originals, there was evidence that rebuilding Pompanos as it stood before the flood would have been twice as expensive as it was to build the Island Bar and Grill. Further, Bates testified that both the Island Bar and Grill and the proposed buildings were of "like kind" to the originals. We

conclude there is more than a scintilla of evidence to prove the replacement buildings were of like kind and quality to the originals.

Insurance Alliance also contends that Highport failed to prove that its repair/replacement costs were reasonable. Insurance Alliance asserts that neither Bates nor Hann testified that the estimated costs for rebuilding the marina were reasonable. Insurance Alliance relies on the following language in the Texas Supreme Court's opinion in *McGinty* in support of this argument: "Estimated-out-of-pocket expenses, like paid out-of-pocket expenses, do not establish that the cost of repair was reasonable. Some other evidence is necessary." *McGinty*, 372 S.W.3d at 627–28.

*McGinty* involved the plaintiff homeowner's remedial damages for breach of a construction contract after water leaks and mold were found in the home. In such a case, the party seeking remedial damages must specifically prove they are reasonable. *Id.* at 627. Further, the jury in *McGinty* was specifically asked to determine the reasonable and necessary cost to repair the home. *Id.* at 626.

We are required to measure the sufficiency of the evidence using the charge given, and the charge here did not require the jury to make a finding that Highport's repair costs and estimates were reasonable. *See United Nat'l Ins. Co. v. AMJ Inv., LLC*, No. 14-12-00941-CV, 2014 WL 2895003, at * 7 (Tex. App.—Houston [14th Dist.] June 26, 2014, no pet. h.). Further, even if Highport needed to prove reasonableness, as noted in *McGinty*, "In some cases, the process will reveal factors that were considered to ensure the reasonableness of the ultimate price." *See McGinty*, 372 S.W.3d at 628. Pursuant to section 18.001 of the civil practice and remedies code, Highport's general manager Timothy Hayes made an affidavit concerning the costs and necessity of services. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 18.001 (West Supp. 2014). Attached to the affidavit was an itemized summary of the services provided to Highport

–14–

by various vendors as a result of the flood through December 2009, along with copies of the corresponding invoices, including invoices from Ceci Bates. Hayes stated in the affidavit that the amounts charged for the services were "reasonable at the time and place that the services were provided." When uncontroverted, such an affidavit is sufficient evidence to support a jury finding that the amount charged was reasonable. *Id.* Thus, there was sufficient evidence the cost of building the Island Bar and Grill was reasonable. Bates used the actual costs of rebuilding that restaurant to estimate the future costs of rebuilding other marina buildings. Based on his experience as a contractor, Bates testified his numbers were reliable and were more reliable than bid numbers. The jury could have inferred from Bates's testimony that the estimates for future repairs were reasonable. *See Bernstein v. Thomas*, 298 S.W.3d 817, 826 (Tex. App.—Dallas 2009, no pet.).

In summary, there was evidence that Highport's property damages, excluding overwater electrical, were as high as $14.6 million and that it could have recovered that amount under the $15 million blanket policy it sought. There was also evidence from McNaught that Highport was entitled to a maximum of $2,915,000 under the policy it actually had; $14.6 million less $2,915,000 is $11,685,000. Even if the jury had determined Highport was entitled to $4,075,000, the property limit under the policy, $14.6 million minus $4,075,000 is $10.5 million. Further, the difference between Hann's estimate of Highport's property damage, $11.2 million, and $2.9 million is $8.3 million, the amount found by the jury. As a general rule, a reviewing court will not interfere with the fact finder's determination of the amount to award as damages if there is any probative evidence to sustain the award. *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831, 837 (Tex. App.—Dallas 1984, writ ref'd n.r.e.). We conclude there is more than a scintilla of evidence to support the jury's finding that Highport's property damages were $8.3 million.

**b. Business Interruption Damages**

Insurance Alliance also contends there is no evidence to support the $438,598 in business interruption damages awarded by the jury in Question 15(c). It asserts there is no evidence of the amount of coverage for business interruption under the policy obtained. Insurance Alliance again asserts that a coverage determination was needed. We have already rejected this argument.

The jury determined that $438,598 was the amount of coverage that would have been available for business interruption damages under the policy sought by Highport, less the amount of coverage provided by the policy actually obtained. CPA Michael Militescu evaluated Highport's damages due to business interruption resulting from the flood. He testified that Highport's business interruption damages were $1,438,598.[3] Further, there was evidence that the policy sought would have provided $4 million worth of business interruption coverage and thus covered that entire amount. There was evidence that the policy Highport actually had provided $3 million of coverage for business interruption over wet property (boat slips, etc.) and $1 million of coverage for business interruption over dry property (restaurants, bars, etc.). Hayes, Highport's general manager, testified that Highport's primary business was boat slip rental, and Highport still generated cash from its rentals after the flood. Hayes testified about the areas of revenue impacted by the flood – gas sales, parts sales, service revenue, and jet ski sales, as well as income from the marina's restaurants/bars, Pompanos, the Waterfront Club, and the Clipper Bar. From the evidence, the jury could have determined that Highport's business interruption losses were due to the fact that its dry property was not operational. It could have further determined that the policy sought would have paid $1,438,598 for business interruption and the policy obtained would have paid $1,000,000, leaving a difference of $438,598, the amount found

---

[3] The reporter's record indicates Militescu actually gave a figure of $1,438,000 even. He may have misspoken or the court reporter may have made a typographical error. When asked to deduct the $188,000 Highport received from Lloyd's pre-litigation for business interruption, the witness stated the difference was $1,250,598.

by the jury. We conclude there is more than a scintilla of evidence to support the jury's answer regarding business interruption damages. Having found that the evidence supports the jury's answers to Question 15, we resolve Insurance Alliance's first issue against it.

## ATTORNEY'S FEES

In its second issue, Insurance Alliance contends the attorney's fee award must fail because Highport did not segregate its fees between Insurance Alliance and Bowood, and the jury assessed all the requested fees against Insurance Alliance, contrary to the evidence. Insurance Alliance asks us to reverse and remand on this issue.

Highport's attorney testified that his client's necessary attorney's fees were $2.8 million. To arrive at that amount, the attorney deducted about $271,000 attributable to the CRC arbitration and $160,000 for fees spent on the settlement with Lloyd's. He also reduced the total amount of attorney's fees by 15% to account for work performed on legal theories that did not allow for recovery of attorney's fees. He testified that there was a "commonality of facts" or "intertwined facts" between the various claims and noted that there was a single transaction or stream of transactions between the brokers. Highport's attorney also testified about attorney's fees in the event of an appeal. Over 500 pages of detailed legal bills were admitted into evidence, as well as a summary of the fees. Highport's expert on attorney's fees supported the attorney's testimony. He testified that Highport's total attorney's fees were $3,747,584. Reducing this amount by 15% left $3,185,446. Deducting the amounts attributable to the CRC arbitration and the Lloyd's settlement resulted in fees of $2,754,446.

The jury was asked about attorney's fees in Question 18, which it was instructed to answer as to a particular defendant only if it answered "Yes" to the breach of contract or DTPA liability questions as to that defendant. Question 18 asked in part:

What is a reasonable fee for the necessary services of Highport's attorney for representation in its claim(s) against Insurance Alliance and/or Bowood, stated in dollars and cents?

. . . .

Answer with an amount for each of the following:

a.      For representation in the trial court.

        1. Insurance Alliance:  2,754,446.00

        2. Bowood:

Having not found any breach of contract or DTPA violations by Bowood, the jury answered Question 18 only as to Insurance Alliance and left the space for Bowood's attorney's fees blank.[4] It determined Highport's attorney's fees for its claims against Insurance Alliance to be $2,754,446, the full amount of fees sought.

Texas law does not allow recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006).  A plaintiff is required to show that attorney's fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees. *Id.* at 311; *see DMC Valley Ranch L.L.C. v. HPSC, Inc.*, 315 S.W.3d 898, 906 (Tex. App.—Dallas 2010, no pet.); *Clearview Props., L.P. v. Prop. Tex. SC One Corp.*, 287 S.W.3d 132, 144 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).  A plaintiff is required to segregate fees between claims for which they are recoverable and claims for which they are not unless "the discrete legal services advance[d] both [the] recoverable claim and the unrecoverable claim." *Tony Gullo Motors*, 212 S.W.3d at 313–14; *Goldman v. Olmstead*, 414 S.W.3d 346, 367–68 (Tex. App.—Dallas 2013, pet. denied); *see Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (per curiam).  The need to segregate fees is

---

[4] Insurance Alliance erroneously refers to the jury's zero finding against Bowood when the jury did not make a finding that Highport incurred no legal fees for its claims against Bowood.  As per the instructions in the charge, the jury did not answer the question regarding Highport's fees as to Bowood because it did not find any breach of contract or DTPA violations by Bowood.  We understand Insurance Alliance's complaint to be with the sufficiency of the evidence to support the jury's finding that Insurance Alliance was responsible for the full amount of Highport's fees.

a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Tony Gullo Motors*, 212 S.W.3d at 312–13; *Goldman*, 414 S.W.3d at 367–68.

Highport presented evidence that it segregated those fees related to claims for which attorney's fees are not recoverable. Insurance Alliance does not challenge this aspect of fee segregation. Instead, it complains of Highport's failure to segregate attorney's fees between it and Bowood.

Unlike most cases in which there is an issue on appeal about fee segregation, the jury here was asked to segregate the fees between the two defendants. The jury found that Highport was entitled to $2.7 million in fees for its claims against Insurance Alliance. Insurance Alliance's complaint is essentially a factual sufficiency challenge to the jury's answer to the segregated question on attorney's fees, which it preserved by raising in its motion for new trial.[5] *See Dal-Chrome Co. v. Brenntag Sw., Inc.*, 183 S.W.3d 133, 145 (Tex. App.—Dallas 2006, no pet.); *see also Arrow Marble, LLC v. Estate of Killion*, 441 S.W.3d 702, 709 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (proof of full amount of fee is some evidence of segregated amount and remand is appropriate to determine correct amount). In reviewing the factual sufficiency of the evidence to support a jury finding for which the party did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The jury determined that Highport was entitled to $2.7 million in fees, the total amount of fees it sought, for its claims against Insurance Alliance. Insurance Alliance maintains this

---

[5] Highport asserts that Insurance Alliance has waived its complaint about Highport's failure to segregate fees. *See, e.g., Lee v. Lee*, 411 S.W.3d 95, 114 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Highport cites Insurance Alliance's failure to object to lack of segregation during the testimony of Highport's two witnesses on attorney's fees and its failure to object to the jury charge. Highport first raised the issue of lack of segregation in its motion for JNOV and raised it again in its motion for new trial.

finding is contrary to the evidence at trial. It asserts Highport's attorney testified that Highport incurred fees "specific to actions by Bowood." Insurance Alliance refers us only to the attorney's testimony about efforts made to get the final insurance policy from Bowood between June and October of 2011. Highport's attorney testified:

> Highport had made a number of requests, both directly by Highport and then through counsel in the litigation to get a copy of its policy for 2007. When the document was first delivered, . . . there were inconsistencies with that policy. It required additional legal work, it required a second trip back to London to take depositions, again, of witnesses that had already been deposed but had not disclosed some of the problems with the 2011 policy.

Highport's claims against Insurance Alliance and Bowood arise out of the same transaction, and Highport had a single injury in that it did not have as much insurance coverage as it requested when its marina was damaged. Insurance Alliance and Bowood were both part of the brokerage chain through which Highport obtained its insurance policy. At some point, there was a breakdown in communication along the chain resulting in Highport not getting the correct coverage. Insurance Alliance and Bowood each blamed each other, as well as CRC and Highport. The jury could have determined that any fees Highport spent to get a final version of the policy from Bowood would have been incurred anyway to bring its claims against Insurance Alliance. We cannot say that the evidence to support the jury's finding that Highport was entitled to $2.7 million in attorney's fees for bringing its claims against Insurance Alliance is so weak as to make the verdict clearly wrong and manifestly unjust.[6] We resolve Insurance Alliance's second issue against it.

---

[6] Insurance Alliance urges that this case is similar to *DMC Valley Ranch*, in which this Court reversed an attorney's fee award because the plaintiff put on evidence only of its total fees instead of segregating them between multiple defendants. *See DMC Valley Ranch*, 315 S.W.3d at 906–07. The case is distinguishable for two reasons. First, it was a summary judgment, not a jury trial. Second, it involved the breach of two separate finance and security agreements. After the borrowers — DMC Valley Ranch and DMC Frisco — defaulted, the lender sued them and a common set of guarantors. Thus, as we noted in our opinion, because the plaintiff sued on two separate agreements, it had to prove different facts to recover against DMC Valley Ranch from those it had to prove against DMC Frisco. *Id.* at 906. And it had to prove different facts to recover on the guaranty agreements. The plaintiff put on evidence only of its total fees, and the trial court allocated 14 % of the fees to DMC Valley Ranch and the other 86% to DMC Frisco, without evidence to support such an allocation. We concluded the plaintiff did not conclusively prove the facts necessary to support the court's fee awards. *Id.* at 906–07.

## BOWOOD'S LIABILITY TO INSURANCE ALLIANCE

In its third issue, Insurance Alliance contends that the evidence is legally and factually insufficient to support the jury's finding that Bowood was not liable to Insurance Alliance under the insurance code. Insurance Alliance's insurance code claim against Bowood was submitted to the jury in Question 19. Question 19 asked:

> Did Bowood engage in any unfair or deceptive act or practice that caused damages to Insurance Alliance?
>
> "Unfair or deceptive act or practice" means any of the following:
>
>> Making or caused [sic] to be made an assertion, representation, or statement with respect to insurance that was untrue, deceptive, or misleading; or
>>
>> Failing to state a material fact about an insurance policy that is necessary to make other statements not misleading, considering the circumstances under which the statements were made; or
>>
>> Making a statement about an insurance policy in such a manner as to mislead a reasonable prudent person to a false conclusion of a material fact; or
>>
>> Failing to disclose any matter about an insurance policy that is required by law to be disclosed; or
>>
>> Making or causing to be made any statement misrepresenting the terms[,] benefits or advantages of an insurance policy.

*See* TEX. INS. CODE ANN. arts. 541.051, 541.061 (West 2009). The jury answered, "No."

Citing evidence that a Bowood employee modified Highport's insurance application documents to delete the word "blanket," Insurance Alliance maintains the evidence conclusively established that Bowood violated the insurance code. Alternatively, it contends the jury's finding that Bowood did not violate the insurance code is against the great weight of the evidence. When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the evidence establishes, as a

–21–

matter of law, all vital facts in support of the issue. *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Id.* at 242.

It is undisputed that Bowood had no direct contact with Insurance Alliance. Insurance Alliance hired CRC. CRC hired Southern Cross. Southern Cross hired Bowood to place the insurance coverage with Lloyd's. Bowood's client was Southern Cross.

There was evidence that Danny Whiteside, a Bowood employee, modified Highport's insurance application documents to delete the word "blanket." Whiteside had a different understanding of what the term "blanket" meant from Highport's understanding, and based on his definition of the term, he did not think it was important. He was not aware that the definition of "blanket" in the United States might be different from the definition in England. Whiteside testified he was never told that the insured wanted blanket coverage. Whiteside testified the application was incomplete, and he asked Bill Sampson at Southern Cross for clarification. Whiteside asked for descriptions, ages, and values of the items being insured and was provided that information. Whiteside used the information to create the Bowood Underwriting Submission. Bowood presented the Bowood Underwriting Submission, not the application documents, to the underwriters to request insurance for Highport containing schedules, sublimits, and coinsurance with penalties.

Sampson with Southern Cross testified that his company did not ask Bowood to procure a quote for insurance that was blanket rather than scheduled or to procure a quote that did not have a coinsurance requirement. When Sampson received a quote from Bowood in March 2007, he understood that the quote was for scheduled coverage instead of blanket coverage and

–22–

understood that it had coinsurance. Sampson indicated it was Insurance Alliance's job to assess Highport's insurance needs and whether a particular policy being offered met those needs.

Insurance Alliance asserts that even though Bowood did not speak directly to anyone at Insurance Alliance or Highport, because Bowood knew Insurance Alliance would rely on information it gave CRC, the fact that Bowood did not make any direct representations to Insurance Alliance does not absolve it from liability. But the jury heard evidence that Bowood's client Southern Cross did not ask Bowood to procure blanket coverage or coverage without coinsurance. And when Southern Cross got the policy back, it knew it was not blanket coverage. While clearly there was a miscommunication at some point in the process, Bowood maintained it happened between CRC and Insurance Alliance, and based on the jury's findings attributing a total of 85% of the responsibility for Highport's injury to CRC and Insurance Alliance and just 10% to Bowood, it appears the jury believed its version of the events. Because the policy Bowood procured from Lloyd's was in line with what its client requested from it, the jury could have determined that Bowood made no deceptive representations or omissions regarding the policy. Likewise, having considered all of the evidence, we cannot say the jury's finding was against the great weight of the evidence.

Insurance Alliance also contends the trial court erred in refusing to allow it to submit other liability and damage theories against Bowood to the jury. Specifically, Insurance Alliance contends it was entitled to jury questions on negligence, negligent misrepresentation, fraud, and fraud by omission, and corresponding questions on its damages and attorney's fees. It maintains that these theories were improperly omitted from the charge based on Bowood's assertion that it never interacted with Insurance Alliance. Insurance Alliance seeks a remand for a new trial on these claims.

The trial court is required to submit to the jury a properly requested question that is raised by the pleadings and evidence and is necessary to enable the jury to render a verdict. TEX. R. CIV. P. 278; *Park N. Serv. Ctr., L.P. v. Applied Circuit Tech., Inc.*, 338 S.W.3d 719, 721 (Tex. App.—Dallas 2011, no pet.). We review a trial court's decision to submit or refuse a particular question for an abuse of discretion. *Park N. Serv. Ctr.*, 338 S.W.3d at 721. Even if the trial court erred by failing to submit a requested question to the jury, we may not reverse unless the error is harmful. *Id.* Error in a jury charge is harmful only if it probably caused the rendition of an improper judgment. *Id.*; *see* TEX. R. APP. P. 44.1(a)(1).

Bowood became a party to this lawsuit when Insurance Alliance filed a third-party complaint against it in federal court. Insurance Alliance asserted claims against Bowood for DTPA violations, violations of various sections of the Texas Insurance Code, breach of warranty, fraud,[7] negligent misrepresentation, and breach of contract under a third-party beneficiary theory, as well as a claim for contribution under the civil practice and remedies code. On Bowood's motion to dismiss under federal rule of civil procedure 12(b)(6), the federal court dismissed some of Insurance Alliance's claims. Insurance Alliance did not amend its pleadings after the federal court's order. Thus, at the time of trial, Insurance Alliance's pleadings did not allege negligence or fraud by omission against Bowood. The trial court did not abuse its discretion in refusing to submit questions on these claims because they were not supported by the pleadings.

Insurance Alliance did allege in its third-party complaint that Bowood was liable to it for fraud and negligent misrepresentation regarding the insurance procured. For purposes of our discussion we will assume, without deciding, that the trial court erred in refusing to submit the requested questions on these claims. Even so, we cannot conclude the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1).

---

[7] Insurance Alliance's pleadings refer to its fraud claim as "misrepresentation."

–24–

Insurance Alliance's requested fraud question stated in part that fraud occurs when a party makes a material misrepresentation with knowledge of its falsity or made recklessly. Insurance Alliance's requested question on negligent misrepresentation asked if Bowood made a negligent misrepresentation on which Insurance Alliance justifiably relied. "Negligent misrepresentation" was defined in part as a representation that supplies false information for the guidance of others in their business. In Question 19, asking about any insurance code violations by Bowood against Insurance Alliance, the jury was asked if Bowood made any untrue representations. The jury answered negatively. Further, the jury was asked about Bowood's proportionate responsibility for Highport's tort claims. In Question 7, the jury was asked if Insurance Alliance, CRC, or Bowood made a negligent misrepresentation on which Highport relied. The jury answered "Yes" as to Insurance Alliance and CRC and "No" as to Bowood. In Question 11, the jury was asked if Insurance Alliance, CRC, or Bowood committed fraud against Highport by failing to disclose information. It answered negatively for all three defendants. It is clear from the charge as a whole that the jury did not find that Bowood made any misrepresentations, and we have found the evidence sufficient to support this conclusion. Thus, any error in refusing the requested questions on fraud and negligent misrepresentation did not probably cause the rendition of an improper judgment and was thus harmless. Insurance Alliance's third issue is without merit.

## HIGHPORT'S CROSS-APPEAL

Highport raises two issues as to Bowood as a cross-appellant.[8] In its first issue, Highport contends it was entitled to its judgment against Insurance Alliance for breach of contract and to a

---

[8] Highport raised these issues in its "Brief of Appellee and Cross-Appellant" filed after Insurance Alliance filed its appellant's brief. Bowood complains about the timeliness with which Highport briefed these issues. Bowood contends that Highport is not in fact a "cross-appellant," but rather a regular appellant. According to Bowood, Highport should have filed its brief complaining of the judgment against Bowood within thirty days after the date the clerk's record or the reporter's record was filed, whichever is later. *See* TEX. R. APP. P. 38.6(a). We conclude Highport's issues against Bowood were timely raised in its appellee's brief. Further, even if the issues were not timely raised, the Court has the authority to extend the time for filing briefs. We note there is no question Highport timely filed its notice of appeal.

–25–

judgment against Bowood for 10% of its damages on a negligence theory, subject to the one-satisfaction rule.[9] Based on the jury's findings that Bowood was negligent and bore 10% of the responsibility for Highport's injury, Highport sought to recover 10% of the damages found by the jury from Bowood. At a hearing on the issue, the court asked Highport to elect and it did not, arguing it was entitled to recover from both Insurance Alliance and Bowood. After Highport refused, the trial court rendered the judgment that gave Highport its greatest recovery. It rendered judgment against Insurance Alliance on Highport's breach of contract claim and ordered that Highport recover $8,738,598, plus court costs, pre- and post-judgment interest, and attorney's fees from Insurance Alliance. The court rendered a take-nothing judgment on Highport's claims against Bowood. Highport asks this Court to modify the judgment to reflect that Bowood is liable for 10% of Highport's damages. We decline to do so.

A party may sue and seek damages on alternative theories of liability. *McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871, 916 (Tex. App.—Dallas 2014, pet. denied) (citing *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) (per curiam)). But for one injury, there can only be one recovery. *Id.*; *see Tony Gullo Motors*, 212 S.W.3d at 303. A judgment awarding damages on alternate theories may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory. *McCullough*, 435 S.W.3d at 916. When a defendant's acts result in a single injury and the jury returns favorable findings on two or more theories of liability, a plaintiff has the right to judgment on the theory entitling it to the greatest or most

---

[9] Under the one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000). In its appellate brief, Insurance Alliance is clear that it does not seek to recover 110% of the damages awarded. However, its proposed judgment sought $8,738,598 in damages from Insurance Alliance and 10% of that amount, $873,859.80, from Highport. It later sought to include the following language in the judgment to limit its recovery: "In no event shall Highport recover a total amount under this judgment that exceeds the amount of the judgment against Insurance Alliance."

favorable relief. *Id.* (citing *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988)). Where the prevailing party fails to make an election, the trial court should use the findings affording the greatest recovery and render judgment accordingly. *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987).

The fact that there were two defendants in this case does not change our analysis. Here, Insurance Alliance and Bowood committed technically different acts that caused Highport to suffer a single injury — Highport had an insurance policy that was inferior to the one it requested. For its single injury, Highport was only entitled to recover under one theory of liability. When it refused to elect a theory of liability, the trial court properly picked the theory, breach of contract, that afforded Highport the greatest recovery — 100% of its damages and attorney's fees. Had Highport wanted to recover from both Insurance Alliance and Bowood, it could have elected to recover on its negligence theory. But, with the jury's findings that Insurance Alliance was 45% responsible and Bowood was 10% responsible, Highport would not have been entitled to 100% of the damages or to attorney's fees under such a theory. We note that the proportionate responsibility scheme found in chapter 33 of the civil practice and remedies code does not apply to contract actions. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.002(a) (West 2008).

In its brief, Highport relies on a 1973 Texas Supreme Court case to support its position that it can recover simultaneously from Insurance Alliance in contract and Bowood in tort. *See Custom Leasing Inc. v. Tex. Bank & Trust Co.*, 491 S.W.2d 869 (Tex. 1973). Highport cites the following language from that case:

> "Where remedies pursued against different persons are repugnant and inconsistent, the election of one bars the other, but concurrent and consistent remedies may all be pursued until satisfaction is had. The bar of an election does not apply to the assertion of distinct causes of action against different persons arising out of independent transactions with such persons."

–27–

*Id.* at 871 (quoting 28 C.J.S. *Election of Remedies* § 8).

While the term "election of remedies" can be used to refer to electing a theory of recovery after a jury returns favorable findings on two or more theories, *see, e.g., Tony Gullo Motors*, 212 S.W.3d at 303, that is not how the term was used in *Custom Leasing*. The term as used in *Custom Leasing* referred to the affirmative defense of election of remedies. Under certain circumstances, this doctrine bars a plaintiff from pursuing two inconsistent remedies. *Medina v. Herrera*, 927 S.W.2d 597, 600 (Tex. 1996); *Pipes v. Hemingway*, 358 S.W.3d 438, 449 (Tex. App.—Dallas 2012, no pet.). The election of remedies doctrine may bar relief when a party successfully exercises an informed choice between two or more remedies which are so inconsistent as to constitute manifest injustice. *Pipes*, 358 S.W.3d at 449; *see City of Glenn Heights v. Sheffield Dev. Co.*, 55 S.W.3d 158, 164 (Tex. App.—Dallas 2001, pet. denied).

In *Custom Leasing*, Custom Leasing entered into an agreement with James Lyles, purportedly acting on behalf of a construction company, to buy trucks and equipment and then lease them back to the company. *Custom Leasing*, 491 S.W.2d at 871. A year earlier, Lyles had negotiated a bank loan on behalf of the construction company. *Id.* at 870. The equipment that was the subject of the later lease had been mortgaged to secure the loan. To obtain the loan, Lyles forged the signature of the construction company's president on the note and mortgage documents. *See id.* at 870. After the payments on the two leases became delinquent, Custom Leasing sued Lyles, the construction company, and the company president to collect the amount due on the leases. *Id.* at 870–71. Custom Leasing obtained a default judgment against Lyles and later learned that the construction company president did not sign any of the loan documents or any of the lease documents. Custom Leasing amended its pleadings to add the bank as a defendant. *Id.* at 871. After the bank had learned of the forgery, it nevertheless affirmed to Custom Leasing that the construction company owed the bank money. As a result, Custom

Leasing paid the bank money to release the mortgage on the equipment. The bank pleaded the defense of election of remedies. It argued that by Custom Leasing's judgment against Lyles for the entire amount of the leases, Custom Leasing waived and abandoned any right to pursue a claim against the bank. *Id.* The supreme court held that Custom Leasing's suit against Lyles on the lease agreements did not preclude Custom Leasing's suit against the bank for its alleged false representation regarding the chattel mortgage. *Id.* at 872. It reasoned that there was nothing inconsistent in suing the "perpetrator of the forgery" of the lease documents and also the bank which falsely reported that the construction company owed it money on a note secured by the equipment. *Id.*

Highport relies on *Custom Leasing* to argue that because the theories under which Insurance Alliance and Bowood are liable to it are consistent, it can recover under both theories. We do not read *Custom Leasing* to stand for or support the proposition that Highport can recover damages under more than one theory of liability for its single injury for which one damage finding was made. We overrule Highport's first issue.

In its second issue, Highport contends that in the event of a retrial on damages, it is entitled to submit a surplus lines cause of action to the jury. Because we have upheld the damage award, we need not address Highport's second issue.

### PENDING MOTIONS

During the course of this appeal, the parties filed four motions which were deferred to the submissions panel and are still pending. Bowood filed a motion to strike a portion of Insurance Alliance's reply brief in which Insurance Alliance argued that if the court's judgment is upheld, the judgment should be reformed to include a provision making Bowood 10% liable for the damages and to provide a "dollar-for-dollar credit" for any amount collected from Bowood. Bowood also filed a motion to strike a portion of Highport's reply brief in which a similar

argument is made.  Bowood objects to these sections of the briefs on grounds that this argument was not raised in the parties' original briefs.  Because we are upholding the trial court's take-nothing judgment in favor of Bowood on Highport's claims against it, we need not decide this issue and deny as moot Bowood's motions to strike portions of Insurance Alliance's and Highport's reply briefs.

Next, Insurance Alliance has filed a motion asking this Court to take judicial notice of the trial court's January 22, 2014 judgment confirming an arbitration award in favor of Highport against CRC.  In its motion, Insurance Alliance asserts that it is entitled to a dollar-for-dollar credit for any amount Highport collects from CRC.  On October 28, 2014, in a separate appeal from that judgment in cause number 05-14-00405-CV, this Court granted CRC and Highport's joint motion to vacate the January 22, 2014 judgment pursuant to settlement.  We vacated the January 22, 2014 judgment, rendered judgment vacating the arbitrators' award, and dismissed the cause with prejudice.  Accordingly, because the judgment has been vacated, we deny Insurance Alliance's motion asking us to take judicial notice of it.  We also deny Highport's November 25, 2013 motion to strike a copy of the arbitrators' award attached to Insurance Alliance's reply brief, but have not considered the award as it has been vacated.

We affirm the trial court's judgment.


/Ada Brown/
ADA BROWN
JUSTICE


121313F.P05

–30–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

INSURANCE ALLIANCE,
Appellant/Cross-Appellee

No. 05-12-01313-CV　　　V.

LAKE TEXOMA HIGHPORT, LLC,
Appellee/Cross-Appellant
and
BOWOOD PARTNERS, LIMITED,
Appellee/Cross-Appellee

On Appeal from the 397th Judicial District
Court, Grayson County, Texas
Trial Court Cause No. 08-0604-397.
Opinion delivered by Justice Brown. Justices
Bridges and O'Neill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that INSURANCE ALLIANCE and LAKE TEXOMA HIGHPORT, LLC each bear its own costs of this appeal. It is **ORDERED** that BOWOOD PARTNERS, LIMITED recover its costs of this appeal from appellant INSURANCE ALLIANCE and cross-appellant LAKE TEXOMA HIGHPORT, LLC.

Judgment entered this 19th day of November, 2014.