E. Peter HEALEY, Appellant

v.

Edwin N. HEALEY, Elizabeth Healey and Michael R. Healey, Appellees

NO. 12-16-00007-CV

Court of Appeals of Texas, Tyler.

Opinion delivered July 12, 2017.

Rehearing Denied October 16, 2017

Steven W. Stark, for Appellant.

Koy R. Killen, for Appellee.

Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.

## OPINION

James T. Worthen, Chief Justice

E. Peter Healey (Pete) appeals from an adverse judgment rendered after a jury trial in this family dispute involving duty and money. Initially brought by his father, Edwin N. Healey (Bud), against Pete and his brothers Paul C. Healey and Mark J. Healey, the suit widened when Pete named his siblings, Elizabeth Healey (Liza) and Michael R. Healey (Mike) as third-party defendants. Pete asserts ten issues raising sufficiency of the evidence and charge error regarding Bud's claims against him,

and attacking the summary judgment rendered in favor of Liza and Mike on Pete's defamation claim. We affirm.

## BACKGROUND

Bud and Betty, residents of a retirement home, asked one of their five children, Pete, to help manage their finances and executed powers of attorney (POAs) naming Pete as their agent. They also loaned money to Pete and allowed him to live in the home they had vacated. Eventually, the family was in turmoil about Pete's handling of Bud and Betty's money. In January 2013, Bud and Betty signed new POAs, naming Mike and Liza as their agents, and relieving Pete of his duties. Also in January, they created a trust, naming Mike and Liza as co-trustees. Betty died in June 2013. Later that year, Bud sued Pete and two of his other sons, Mark and Paul, in Tarrant County, to recover certain sums of money. Bud alleged breach of fiduciary duty and breach of contract by Pete. Additionally, he sued all three for money had and received, and he sued Pete and Paul for violations of the Texas Theft Liability Act. Pete sued siblings Mike and Liza in Henderson County, asserting defamation and breach of fiduciary duty. The Tarrant County court granted Pete's motion to transfer venue to Henderson County, and the two cases were consolidated.

The trial court granted Mike and Liza's motion for partial summary judgment on Pete's defamation claim and the parties proceeded to a jury trial on the remainder of the issues. The jury found in favor of Bud, Mike, and Liza. The trial court rendered judgment on the jury's findings, awarding Bud actual damages, exemplary damages, and attorney's fees, awarding Mike and Liza attorney's fees, and ordering that Pete take nothing on all claims asserted by him. Pete alone appealed from the final judgment.[1]

## PARTIAL SUMMARY JUDGMENT-DEFAMATION

In his first issue, Pete contends the trial court erred in granting Mike and Liza's motion for partial summary judgment which disposed of his defamation claim against Mike and Liza. He asserts that emails written by Mike and Liza contain defamatory content and he was damaged by their defamation of him. Pete argues that Mike and Liza passed their hostility and defamation of Pete to Bud and Betty and, when combined with his parents' diminished capacity, led to his parents' execution of POAs in January 2013, which precipitated this controversy.

Pete alleged that Mike and Liza published defamatory statements to family members and friends. Mike and Liza filed a combined no evidence and traditional motion for partial summary judgment, arguing there is no evidence of the elements of defamation. While the motion addressed all of Pete's claims against Mike and Liza, the trial court granted the motion only as to Pete's defamation claim.

### Standard of Review

We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). After adequate time for discovery, a party without the burden of proof at trial may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense. TEX. R. CIV. P. 166a(i). The motion

1. The trial court rendered a default judgment against Mark Healey and severed the cause against him. Mark is not a party to this appeal. *See Healey v. Healey,* No. 12-15-00047- CV, 2016 WL 4098750 (Tex. App.—Tyler July 29, 2016, pet. denied) (mem. op. on reh'g). Paul did not file a notice of appeal.

must specifically state the elements for which there is no evidence. *Salazar v. Ramos*, 361 S.W.3d 739, 745 (Tex. App.—El Paso 2012, pet. denied). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged element. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006).

A no evidence summary judgment is essentially a pretrial directed verdict and is therefore reviewed by the same legal sufficiency standard applicable to a directed verdict. *Id.* at 581; *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). The entire record must be reviewed in the light most favorable to the nonmovant, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence and inferences unless reasonable jurors could not. *Gonzalez v. Ramirez*, 463 S.W.3d 499, 504 (Tex. 2015) (per curiam). As pertinent here, a no evidence challenge will be sustained when there is a complete absence of evidence of a vital fact or the evidence offered to prove a vital fact is no more than a mere scintilla. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair minded jurors to differ in their conclusions. *Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006) (per curiam); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). When a party has moved for summary judgment on both traditional and no evidence grounds, we typically first review the propriety of the summary judgment under the no evidence standard. *See* Tex. R. Civ. P. 166a(i); *Merriman*, 407 S.W.3d at 248.

### Applicable Law

The elements of defamation include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (orig. proceeding). A statement is defamatory if it tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation. Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2017); *Main v. Royall*, 348 S.W.3d 381, 389 (Tex. App.—Dallas 2011, no pet.). To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace. *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 356 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). But a communication that is merely unflattering, abusive, annoying, irksome or embarrassing, or that only hurts the plaintiff's feelings, is not actionable. *Id.*

Subjective assertions are not actionable as defamation. *Fawcett v. Rogers*, 492 S.W.3d 18, 28 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (op. on reh'g). Statements that are not verifiable as false cannot form the basis of a defamation claim. *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013). A defamatory statement must be sufficiently factual to be susceptible of being proved objectively true or false, as contrasted from a purely subjective assertion. *Vice v. Kasprzak*, 318 S.W.3d 1, 18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Expressions of opinion may be derogatory and disparaging but nevertheless be constitutionally protected. *Id.* Whether a publication is an actionable statement of fact or a constitutionally protected opinion is a question of law. *Main*, 348 S.W.3d at 389. If we determine that the statements are not capable of a defam-

atory meaning, we need not consider whether the complained-of statements are false or not substantially true. *See Huckabee v. Time Warner Entm't Co., L.P.*, 19 S.W.3d 413, 429 (Tex. 2000).

Analysis

In response to the motion's contention that there is no evidence of defamation, Pete presented his affidavit referencing attached emails. In his affidavit, Pete states that the "emails are an assertion of fact, referring to [Pete] which contain numerous false statements of [his] acts, reputation and character." This statement is conclusory and therefore no evidence. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam).

As an exhibit to his affidavit, Pete included an email chain between Liza and Pete's daughter, Paige, who had recently visited Bud and Betty. Paige initiated contact, addressed to several family members, describing her observations of her grandparents and expressing certain concerns. Liza responded, "copying [her] daughters." Regarding Bud and Betty's finances, she stated that some items "are covered by Medicare which loosens the tight budget restrictions Mom and Dad must endure because Pete refuses to return their funds and repay the significant loans he made to himself from their funds." In response to Paige's response, Liza admonished Paige, stating, "If you are truly concerned about your grandparents' care and comfort, you will encourage your father to return their money, repay the loans and provide Mike and me with the records we so desperately need to continue to act in Mom and Dad's best interest."

 Liza merely complained that Pete failed to return money and provide records. This would appear to be objectively verifiable. Pete presented a one page document he called a summary of income and resources of Bud and Betty. It is extremely general but does list Pete's name and the amount "175,500.00" under the heading "Secured Note." Pete also presented a second version of the same document. The second summary states that Pete owes "200,000.00." Neither summary mentions funds returned by Pete or shows that he turned over accounting records to anyone. Pete did not present any summary judgment evidence raising a fact issue on whether Liza's comments were false. *See Neely*, 418 S.W.3d at 62; *Tamez*, 206 S.W.3d at 582.

 Pete also relied on a lengthy email, dated January 8, 2013, written by Mike in response to an email from Pete. In the email, addressed to the siblings, Mike described his "view of Pete's behavior." Mike referenced Pete's "belligerence," "awful behavior," and "bizarre behavior," saying Pete "goobers his way through life, consequences be damned," "operates in secrecy," "knows how to be offensive," and is their parents' "greatest threat." He stated that Pete's words will have no value to Mike until Pete "sobers up and shows some interest in correcting his awful behavior." Mike provided the following unflattering description of his brother:

> ... his heart is not in the right place. . . . The man is evil, he is vicious, he is destructive, he is a coward, and he is cruel. Dealing with him on any level is tedious and nauseating. It has become a blood sport of loud-mouthed screaming and distortions, his cutting me off in mid-sentence so he can resume spewing his wisdom and then violence. . . . I now suspect a hidden agenda. . . .

Mike also explained that comments by Pete of an "insulting and painful nature" are a "source of joy for Pete." Mike called Pete an idiot and claims that Pete will not research solutions to problems regarding

their parents because that would not "support his venom" that Mike and his wife are not caring for Bud and Betty. He asserted that "Pete is portraying himself to be a self-sacrificial martyr. . . ." Mike said he does not trust Pete's judgment and is unclear about his motives. In commenting on Pete's intent to find a mate, Mike opined that, in exchange for a beautiful home, "what chick wouldn't want. . . . a husband who will provide her with a unique relationship in which she can be punched, slapped, screamed at and berated." He explained that "[s]he would now have someone willing to tell her what her opinions are, make her feel stupid, inferior and worthless in every way and like any other piece of simple chattel or personal property of [his]." He proclaimed that no one likes to be treated like Pete treats people, especially someone who has "more attractive options, including suicide."

Mike asserted that Pete makes "petty and pathetic misrepresentations of the words of others" and "[g]arbage from Pete can come at a fast and furious rate. . . ." Mike described Pete's treatment of their brother Mark in evicting him from their parents' home. He said Pete acted like a coward, using slash and burn tactics with no notice or opportunity to mitigate, and Mark was forced to retrieve his possessions on Pete's time frame. Referencing a burglary of their parents' home, Mike told his siblings, "[t]hat worthless, low life, contemptible piece of shit accused [my son] of stealing heirlooms from his own family!" Mike asserted that the accusation was intended to "deflect attention away from Pete's own incompetence" and "[t]here is no level too low for Pete." Mike asserted that "Pete's nonsense" convolutes matters and increases the family's difficulty. Mike opined that Pete is unable "to connect the dots and reach a rational conclusion." Mike also wrote about his greatest concern, the failure to execute a will or establish a trust, saying that Pete was "procrastinating into oblivion."

Mike explained to his readers that his letter contains his views about Pete and his behavior. He used numerous derogatory adjectives to describe his subjective beliefs and opinions about Pete. Further, he guessed at how Pete might treat a "chick." We conclude as a matter of law that these are statements of opinion, not fact. *See Main*, 348 S.W.3d at 389. These comments, although disparaging, are not actionable. *See Vice*, 318 S.W.3d at 18. Regarding Mike's references to the eviction of Mark and the burglary of their parents' home, Pete presented no evidence raising a fact issue on whether these were false statements. *See Neely*, 418 S.W.3d at 62; *Tamez*, 206 S.W.3d at 582. Finally, Mike's assertion that Pete failed to produce a will or trust, an example of Pete's propensity to procrastinate, is shown by other evidence to be true. Pete's email of December 6 indicates that he had not yet hired an attorney to draft wills and the trust. Pete also included a copy of the Healey Family Irrevocable Trust in his summary judgment evidence, which is dated January 25, 2013, more than two weeks after Mike's email. Procrastination may not be seen as a positive attribute, but this statement is not likely to injure Pete's reputation or impugn his character. *See In re Jennings*, 203 S.W.3d 32, 36 (Tex. App.—San Antonio 2006, original proceeding).

We conclude that most of the content of the emails is not defamatory. *See John Moore Servs., Inc.*, 441 S.W.3d at 356. As for the remaining comments, Pete failed to present evidence that raises a fact question on whether the statements are false. *See Neely*, 418 S.W.3d at 62. The trial court did not err in granting Mike and Liza's motion for partial summary judg-

ment to dispose of Pete's defamation claim against them. *See Merriman*, 407 S.W.3d at 248. We overrule Pete's first issue.

## BREACH OF FIDUCIARY DUTY BY MIKE AND LIZA

In his issues two through four, Pete raises questions regarding his claim of breach of fiduciary duty by Mike and Liza as trustees.

### Evidence of Breach by Trustees

Mike denied that he and Liza acted for their own benefit or engaged in self-dealing. He testified that the siblings all agreed that the trust funds were to be used for Bud's benefit. He understood that the trust proceeds were to be used to care for his parents until their death. He stated that was what his parents wanted. He stated that the money placed in the trust was used for Bud's care. He denied spending the trust funds for his and Liza's benefit. He explained that there are checks written to him and his wife as reimbursement for out of pocket expenses to his parents. Although the trust provides that the trustee shall distribute to descendants, Mike testified that there should be no distributions to anyone until Bud dies. Mike testified that the trust is empty.

In the latter part of 2012, Pete hired an attorney, Chuck Bauman, to draft the trust instrument. Bauman testified that he did not recall Pete saying that Bud and Betty's assets were to be used for their purposes. He explained that, to preserve assets from long term care costs in compliance with Medicaid rules, the trust must be irrevocable; there can be no direct benefit to the parents at that point. The trust has to be set up as a completed gift to the children. Therefore, distributions to the grantors, Bud and Betty, would not be in accordance with the trust. Bauman testified that any named beneficiary should be entitled to an accounting.

Liza denied that she or Mike ever acted for their own benefit as POA. She and Mike have demanded repayment of funds Pete deposited in a Southside Bank account. She testified that they wanted their parents' assets protected for their benefit. She stated that she did not pay any attention to the terms of the trust regarding whether funds could be used for Bud and Betty. She explained that the understanding from the beginning was that the money is to be used for her parents' benefit, and the trust funds would be distributed according to their wishes. She further explained that her parents wanted privacy and did not want the beneficiaries to have an accounting. She claimed that she did not need to provide an accounting to Pete when he owed money to her parents. Liza testified that Paul received an accounting. She denied that she or Mike used trust funds for their own benefit. She explained that expenditures from the trust account paid for Bud's living expenses, health care, and attorney's fees. She denied paying her personal attorney's fees out of the trust funds. She denied writing checks to herself or her husband from the trust account. She claims that all her actions, as well as Mike's actions, have been done in good faith. Liza stated that there has been no income to the trust and no distributions from the trust. She clarified that approximately $225,000 has been deposited or contributed to the trust and about $700 remains. About $100,000 of that paid for Bud's attorney's fees.

Bud testified that he and all family members involved thought that the trust would allow them to use trust funds for him and Betty.

Pete testified that Liza and Mike absconded with funds. He testified that the trust was not set up to fund Bud's normal living expenses and legal fees. It was set up to fund their medical needs if those

needs become greater than current income. When asked if there were any specific instances when Mike and Liza did one thing when they should have done something else, Pete responded yes, quite a few. He explained that the trust has been depleted so as a beneficiary he suffered monetary loss. He also recited the depletion of the trust as evidence that Mike received monetary benefit for his actions as trustee. Pete testified that trust bank statements show disbursements to Liza in the amount of $5,950.34 and disbursements to Mike in the amount of $9,638.38. Pete asserted that his parents should have received a refund on their house insurance but that was not reflected in the records. Additionally, he found no documentation regarding proceeds from an insurance claim for water damage. Further, the $1,000 refund from Bauman was not placed in the trust.

Paul testified that the entire family wanted Bud and Betty's assets placed in a trust to be used for their benefit. He stated that he was initially ignored when he asked to see the trust instrument, but he finally saw a copy in the fall of 2013.

Section G of the trust provides that each trustee shall be held harmless from liability for any action taken or for the failure to take any action, if done in good faith and without gross negligence.

### Trial Amendment and Jury Questions on Trustees' Breach of Fiduciary Duty

In his third issue, Pete contends the trial court erred in submitting Questions 23 and 25 as worded and in failing to submit his requested questions on Mike and Liza's breach of fiduciary duty as trustees. He argues that the questions erroneously conditioned a finding of breach on benefit to Mike or Liza. In his fourth issue, Pete contends the trial court erred in denying his second motion for trial amendment by which he attempted to clarify

issues of breach previously pled to specify the duties breached.

In his petition, Pete alleged that Liza and Mike, as trustees, breached their fiduciary duty to Pete and other trust beneficiaries by inappropriate and imprudent distributions, acts or failure to act, and giving benefit to themselves. Pete moved for a trial amendment to supplement his pleadings to conform to evidence presented in which he identified nine ways Liza and Mike purportedly breached their fiduciary duties as trustees. Specifically, Pete asserted:

ELIZABETH HEALEY and MICHAEL R. HEALEY breached their fiduciary duties as Trustees by breach of their duty to make full disclosure of material facts to beneficiaries, their duty to account to beneficiaries, their duty to act in good faith, their duty to make distributions only to beneficiaries named in the trust, their duty to make expenditures only for purposes provided in the trust document, their duty to place the interest of beneficiaries before their own and not to use the advantage of their position to gain any benefit for themselves at the expense of the beneficiaries, their duty not to place themselves in any position whether [sic] self interest to [sic] compete with their obligations as Trustees, their duty to act jointly, and their duty to make reasonable use of the confidence placed in them.

Pete also presented a request for a jury question asking if Mike and Liza failed to comply with one or more of those nine specific duties as trustees.

A primary function of trial amendments is to conform the pleadings to the proof when issues not raised by the pleadings are tried by express or implied consent of the parties. TEX. R. CIV. P. 67; *Bell v. Meeks*, 725 S.W.2d 179, 179-80 (Tex.

1987)..An issue is tried by consent when a party introduces evidence to support an. issue that is not included in the written pleadings and no objection is made to the lack of pleadings. *Pine Trail Shores Owners' Ass'n, Inc. v. Aiken*, 160 S.W.3d 139, 146 (Tex. App.—Tyler 2005, no pet.). A court may not refuse a trial amendment unless the opposing party presents evidence of surprise or prejudice, or the amendment asserts a new cause of action or defense, and thus is prejudicial on its face. *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994) (per curiam). If the trial amendment is not mandatory, the decision to permit or deny the amendment rests within the sound discretion of the trial court. *Id.*

A trial court is required to submit to the jury a properly requested question that is raised by the pleadings and evidence. Tex. R. Civ. P. 278; *Grohman v. Kahlig*, 318 S.W.3d 882, 888 (Tex. 2010) (per curiam). We review a trial court's decision to submit or refuse a particular question for an abuse of discretion. *Ins. Alliance v. Lake Texoma Highport, LLC*, 452 S.W.3d 57, 76 (Tex. App.—Dallas 2014, pet. denied). The trial court's broad discretion is subject only to the limitation that controlling issues of fact must be submitted to the jury. Tex. R. Civ. P. 278; *City of the Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex. App.—Fort Worth 2008, pet. dism'd).

The petition pleads breach of fiduciary duty "by inappropriate and imprudent distributions, acts or failure to act and giving benefit to" Liza and Mike. The enumerated duties in the trial amendment are subsumed within the claims recited in Pete's petition. The testimony, in general, concerned the purpose of the trust, distribution of trust funds, and accounting for trust activity. The evidence presented was relevant to the issues raised by the pleadings.

Pete relies on the same evidence to prove pled and unpled breaches of fiduciary duty. Under these circumstances, there is no indication that Mike and Liza understood the nine enumerated breaches to be issues in the case. *Kohannim v. Katoli*, 440 S.W.3d 798, 810 (Tex. App.—El Paso 2013, pet. denied). An issue is not tried by consent if the evidence relevant to that issue is also relevant to other issues raised by the pleadings. *See Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 446 (Tex. 1993). Therefore, it cannot be said that the issues in the trial amendment were tried by consent. *See Harrison v. City of San Antonio*, 695 S.W.2d 271, 278 (Tex. App.—San Antonio 1985, no writ). Accordingly, the trial court did not abuse its discretion in denying Pete's motion for a trial amendment. *See Kilpatrick*, 874 S.W.2d at 658. Likewise, because Pete's requested jury question mirroring the trial amendment was not raised by the pleadings, the trial court did not abuse its discretion in refusing to submit the question. *See Grohman*, 318 S.W.3d at 888.

In Question 23, the jury was asked: "Do you find by a preponderance of the evidence that Mike Healey, as Trustee of the Trust, breached his fiduciary duty to Pete Healey by inappropriate and imprudent distributions, acts or failure to act and giving benefit to Mike Healey?" Question 25 asked the same question as to Liza as trustee of the trust. The jury answered no to both questions. The questions were accompanied by the following instructions:

> You are instructed that a trustee owes fiduciary duties to the beneficiaries of the trust he administers. As such, the trustee owes the beneficiary a duty of good faith, fair dealing, honest performance, loyalty and accountability. A trustee must fulfill his duties with reason-

able care, diligence, good faith, and judgment.

"Good faith" means an action that is prompted by honesty of intention and a reasonable belief that the action is probably correct.

Pete complains that these questions "were erroneous in that they were conditioned upon benefit to Liza and Mike...." As recited above, Pete's petition alleged that Mike and Liza, as trustees and fiduciaries, breached their fiduciary duty to Pete "by inappropriate and imprudent distributions, acts or failure to act and giving benefit" to Mike and Liza. The questions under attack duplicate Pete's assertion in his pleading. Furthermore, we disagree that a finding of breach was conditioned on a finding of a benefit to the trustees. In the pleading and the questions, obtaining a benefit can be read as one of the ways the trustees have allegedly breached their fiduciary duty. Because the question reflects issues raised by the pleadings and the evidence, the trial court did not abuse its discretion in submitting Questions 23 and 25 as worded. *See Grohman*, 318 S.W.3d at 888. We overrule issues three and four.

## Sufficiency of the Evidence of Trustees' Breach of Fiduciary Duty

In his second issue, Pete asserts the evidence is legally and factually insufficient to support the jury's answers to Questions 23 and 25 regarding breach of fiduciary duty by Mike and Liza as trustees. He argues that Mike and Liza drained the trust by making inappropriate distributions to pay for Bud and Betty's expenses, and failed to act jointly, provide beneficiaries with a copy of the trust, and give a full accounting as required by the trust.

### Standard of Review

A party attacking the legal sufficiency of an adverse finding on an issue on which he had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). In conducting a legal sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that supports it. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827. We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *Id.* The trier of fact is the sole judge of the witnesses' credibility and the weight to afford their testimony. *Id.* at 819.

### Applicable Law

To prevail on a claim for breach of fiduciary duty, a plaintiff must prove the existence of the fiduciary relationship and a breach of that duty by the defendant, which caused damages to the plaintiff or benefit to the defendant. *Jordan v. Lyles*, 455 S.W.3d 785, 792 (Tex. App.—Tyler 2015, no pet.) (op. on reh'g). A power of attorney creates an agency relationship, which is a fiduciary relationship as a matter of law. *Id.* Further, a fiduciary relationship exists between a trustee and the trust beneficiary, and the trustee must not breach or violate this relationship. *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 735 (Tex. App.—Corpus Christi 1994, writ denied). A fiduciary owes his principal a strict duty of good faith, fair dealing, honest performance, and strict accountability. *In re Estate of Miller*, 446 S.W.3d 445, 455 (Tex. App.—Tyler 2014, no pet.). A fiduciary may not use his position to self-deal. *See Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 508-10

(Tex. 1980). We conduct our sufficiency review in light of the charge as given. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 220 (Tex. 2005).

### Analysis

■ The evidence recited above shows that the attorney who drafted the trust intended for it to be used to protect assets and for the children of Bud and Betty to be the beneficiaries. However, Bud and his children believed the trust was to be used for his and Betty's benefit during their lifetime. Over $15,000 of trust fund money was disbursed to Mike and Liza. Although the record does not contain documentation tracing how that money was spent, Mike and Liza testified that the money was all spent for the benefit of their parents. Both Mike and Liza denied using trust funds for their own benefit. Under the terms of the trust, Pete is not entitled to an accounting if he has not repaid loans and advances made by Bud and Betty. Liza did provide an accounting to Paul. Most significantly, the trust provides that each trustee shall be held harmless from liability for any action taken or for the failure to take any action, if done in good faith and without gross negligence. Pete points to no evidence of a lack of good faith or of gross negligence. We conclude that there is no evidence of a breach of fiduciary duty by Liza or Mike as trustees. *See Jordan*, 455 S.W.3d at 792. Accordingly, Pete did not meet his burden to show the jury's answers to Questions 23 and 25 are not supported by the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 241. We overrule Pete's second issue.

### BREACH OF FIDUCIARY DUTY BY PETE

In his fifth issue, Pete contends that the evidence is legally and factually insufficient to support the jury's answer to Questions 1 and 2 regarding breach of his fiduciary duty to Bud. He argues that the transactions occurred prior to Betty's death but there was no evidence to show Betty's interest passed to Bud rather than Betty's heirs or beneficiaries. Contending that the evidence was of collective damages of Bud and Betty, the jury questions related to only Bud's damages, therefore, his argument continues, the evidence does not support the specific award the jury made. He further asserts that there is no evidence or insufficient evidence to support the amount of damages awarded by the jury. Pete contends that the question was conditioned on his actions under power of attorney yet all of the substantial transactions occurred before he was appointed attorney-in-fact.

### Evidence of Breach by Pete

Mike testified generally regarding a litany of misdeeds by Pete. He stated that Pete bought himself a truck with $6,000 of Bud's money and rented a storage unit, paid for with $3,000 of Bud's money. Although ostensibly to store his parents' belongings, the unit contained mostly Pete's belongings. Additionally, Pete lived in their parents' home, used their funds to pay the bills, and made purchases with Bud's credit card. Mike testified that Pete tried to transfer money from Bud's Schwab account by impersonating Bud. Mike explained that their parents loaned Pete money to repair the seawall at Pete's lake house, and Pete paid off his mortgage with Bud's money. Mike testified that Bud loaned $191,000 to Pete, and Bud has demanded repayment.[2] Mike admitted that Pete repaid $8,900. Mike also stated that Pete returned $99,800, which was put in the trust.[3] He explained that Pete and Paul

---

2. Other evidence refers to a $195,000 loan. Apparently, both refer to the same loan.

3. The record provides no clear explanation as to what this money is in repayment of.

opened an account to repay debt to their parents when Pete sold his home, depositing $186,620.99, but that money was not paid to Bud. Mike testified that Pete transferred money from Bud's accounts to two Schwab accounts in the names of Pete and his ex-wife. Those accounts hold $53,100.54 and $3,894.43 respectively. Mike testified that the total amount owed by Pete is $243,615.42.[4]

A December 2012 summary of Bud and Betty's income and resources lists a secured note to Pete for $175,500.[5] Pete created a document entitled "Funds Lent to Pete" dated May 16, 2013. It identified a balance of $186,620.99. In May 2013, that amount was deposited in a Southside Bank account. Those funds were later garnished. In January 2014, Pete prepared a summary of his parents' income and resources which lists a secured note to Pete in the amount of $190,521. In a separate summary of Bud's account balances, prepared by Pete in January 2015, Pete's mortgage in the amount of $190,520.99 is listed in a column entitled "Asset Accounts."

Bauman recommended that Pete move some assets out of his parents' names and into Pete's name at the end of 2012 for tax purposes. In February 2013, Bauman instructed Pete to close the Southside Bank account and give all of the money to Bud because Bud asked that the money be returned.

Liza testified that Pete never repaid the money Bud loaned him. She said Pete lived rent-free in Bud's house, paid utilities with Bud's money, and used Bud's credit card. She stated that the Schwab accounts were garnished. Liza testified that Pete has not turned over all documentation of his parents' financial records or passwords for accounts.

Bud testified that he removed Pete as POA because Pete was spending Bud's money "mostly on himself." He explained that Pete was supposed to pay back the $195,000 loan when he sold his lake house but he did not repay it. Bud told Pete he wanted his money back and that he could not use Bud's money to solve family squabbles. He did not tell Pete that he could hold $55,000 of Bud's money in Schwab accounts. He asked the court to freeze that money and filed suit to get his money back. Bud explained that he rented the storage building to hold Bud's property at Pete's request. But ninety-five percent of the contents belonged to Pete. Bud testified that Pete lived in his home without his knowledge. Bud stated that Pete stole from him and that Mike and Liza told him they have evidence that Pete stole from him.

Pete testified that as of May 13, 2013, he owes Bud $186,620.99. That money is in an account at Southside Bank that has been frozen by a Fort Worth court.[6] He said he always intended to repay the money. He did not return the money because he believed Bud was being unduly influenced, and Pete was protecting Bud's assets. He said the loan was not tied to a time or place of repayment and he intends to repay it when he is confident that the money is used for Bud's care. He denied that the transaction was a loan but stated that he has a moral obligation to repay the money.

4. Our calculations come to $243,615.96.

5. Mike testified that this loan was to pay for repairs to the seawall at Pete's house. However, the record is not clear as to whether this represents a completely different loan from the $195,000 loan, but apparently it is part of the same loan. Evidence shows the $195,000 amount is a congregate of four separate transactions on three different dates.

6. The money in the account was garnished by the Tarrant County Court prior to the change of venue.

He said he did not see it as a gift, but his parents did. He said that everyone knew the funds had been set aside for Bud and Betty's care, and they would get the money when Pete was satisfied that the trust, if valid, was appropriately funded. He admitted that he is holding Bud's money and stated that Bud is understandably angry because Pete did not return his money. He explained that he turned over $99,800 of the $100,000 that was previously in the Southside Bank account. And he later put $186,000 in that account. Pete explained that his ex-wife's loan was secured by his house and he used his parents' money to pay it off as part of the divorce settlement. His parents' money was also used to make improvements on Pete's home and repair the seawall. He sold the home in September 2012 for approximately $363,000.

On cross-examination, Pete explained that the frozen Schwab accounts were set up to pay reoccurring expenses and receive monthly income checks. Pete testified that Bud requested that Pete buy the truck and that Pete used it to move lawn care equipment to take care of his parents' yard. He stated that he lived in his parents' house for four or five months. Pete testified that although he had no legal obligation to repay the money, he never intended to deprive Bud and Betty of property, assets, or money.

Paul testified that Pete owes Bud $186,000, and Pete intended to repay Bud. Paul stated that Mike never showed him any evidence that Pete stole from their parents. He testified that Bud left several voicemails berating Pete about getting his money back. Pete and Paul delivered a check to Bud in the amount of $99,800 on February 20, 2013.

Pete's ex-wife, Martha, testified that Pete was holding Bud's money for safekeeping.

The record includes a letter written by Paul's attorney, dated August 5, 2013, in which she states that the funds loaned to Pete were given to him in four separate checks totaling $195,000. She stated that Pete repaid $8,900. She explained that Pete transferred a Schwab account valued at $105,000 into his name. Additionally, $33,688.29 was transferred to Pete's account from Prosperity Bank. After subtracting approximately $38,000 that Schwab took back due to a fraud alert, approximately $102,000 was left in Pete's account.

## Standard of Review

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). We must sustain a no evidence contention only if (1) the record reveals a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

When a party challenges the factual sufficiency of the evidence supporting a finding for which he did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 376 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (op. on reh'g).

In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Cain*, 709 S.W.2d at 176. The jury may choose to believe one witness over another, and a reviewing court cannot impose its own opinion to the contrary. *City of Keller*, 168 S.W.3d at 819. Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict if reasonable human beings could do so. *Id.*

### Applicable Law

██ A power of attorney creates an agency relationship, which is a fiduciary relationship as a matter of law. *Jordan*, 455 S.W.3d at 792. All transactions between a fiduciary and his principal are presumptively fraudulent and void; therefore, the burden lies on the fiduciary to establish the validity of any particular transaction in which he is involved. *Id.* The fiduciary must show that he acted fairly and informed the principal of all material facts relating to the alleged transaction. *Id.*

### Analysis

██ In Question 1 the jury was asked: Do you find by a preponderance of the evidence that Pete Healey, in his role as Power of Attorney, breached his fiduciary duty owed to Bud Healey by: (i) borrowing money without interest and not paying it back; (ii) transferring Bud Healey's funds to his own accounts; and/or (iii) negotiating checks payable to himself from Bud Healey's accounts?

The jury was instructed that a person acting under a POA is a fiduciary toward the person who appointed him and named the duties owed by a fiduciary. The jury answered "yes" to Question 1. Question 2 asked what sum of money would compensate Bud for damages resulting from Pete's breach of fiduciary duty. The jury answered $243,615.42.

Pete testified that his parents entrusted him to manage their assets for twenty years. He later testified that he dealt with their income and expenses for about two years. The record shows that Pete was first named POA for his parents on March 14, 2011. Therefore, he was in a fiduciary relationship with Bud until January 8, 2013 when he was replaced by Mike and Liza. *See Jordan*, 455 S.W.3d at 792. Although some transfers occurred in 2010, Pete was in a fiduciary relationship with his parents at that time. Moreover, the jury was entitled to find that Pete, "in his role as Power of Attorney" breached his fiduciary duty because, while acting as Bud's fiduciary, he failed to repay the money after Bud repeatedly directed Pete to return it to him. Pete's use of Bud's money constitutes self-dealing. *See Moore*, 595 S.W.2d at 510. Pete did not offer evidence to establish the fairness of the transfers and has not rebutted the presumption that the transactions are fraudulent. *See Jordan*, 455 S.W.3d at 792. Whether characterized as a gift or a loan, both sides agreed that Bud provided at least $195,000 to Pete, that Pete still owes $186,620.99 of that amount, and it is in an account at Southside Bank. Pete admitted that he obtained this money from Bud and has not repaid it even though Bud has repeatedly asked for it to be returned. The evidence also shows that Pete transferred Bud's money to Schwab accounts in the name of Pete and his ex-wife. At the time of trial, those accounts held $53,100.54 and $3,894.43. The sum of the Southside account and the two Schwab accounts is $243,615.96. The jury awarded $243,615.42, the exact amount Mike testified that Pete owed.

We find no merit in Pete's complaint that the evidence was of collective damages of Bud and Betty while the jury awarded all damages to Bud, the sole plaintiff. Pete obtained the sums at issue before Betty died. However, the trial took place after Betty's death. The witnesses spoke of Bud's money. Bud testified that he wanted his money back. Pete testified that he was holding Bud's money, for Bud's use. Furthermore, the evidence shows that Betty had five children, did not have a will, and was married to Bud at the time of her death. Betty's estate passed to Bud upon her death as a matter of law. *See* TEX. ESTATES CODE ANN. § 201.003(b)(2) (West 2014). The jury's findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176. We conclude that the evidence is legally and factually sufficient to support the jury's answers to Questions 1 and 2. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176. We overrule Pete's fifth issue.[7]

## REQUESTED JURY QUESTION REGARDING JANUARY 2013 POAS

In his ninth issue, Pete asserts that the trial court abused its discretion by denying his requested jury question by which he sought a finding that the January 8, 2013 POAs were obtained through undue influence, a lack of mental capacity, and/or fraud. He contends that the issue was raised by his pleadings and the evidence and properly requested.

Appellees respond by asserting that Pete lacks standing to complain about the validity of the POAs. They contend that because Pete is not Bud's legal representative, and because Pete cannot show that the POAs caused any injury to Pete, he lacks standing to assert this claim, and this court lacks jurisdiction to decide this issue.

### Applicable Law

The standing doctrine identifies those suits appropriate for judicial resolution. *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001). Standing pertains to a person's justiciable interest in a suit and is a component of subject matter jurisdiction. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444, 445-46 (Tex. 1993). Standing limits subject matter jurisdiction to cases involving a distinct injury to the plaintiff and a real controversy between the parties, which will be actually determined by the judicial declaration sought. *Brown*, 53 S.W.3d at 305. Standing concerns the question of whether a party has a personal stake in the outcome of the controversy or an enforceable right or interest. *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005); *Brown*, 53 S.W.3d at 305.

A trial court is required to submit to the jury a properly requested question that is raised by the pleadings and evidence. TEX. R. CIV. P. 278; *Grohman*, 318 S.W.3d at 888. We review a trial court's decision to submit or refuse a particular question for an abuse of discretion. *Ins. Alliance*, 452 S.W.3d at 76. If a trial court errs by refusing to submit a request-

---

7. Due to our disposition of Pete's fifth issue, we need not address his issues six, seven, or eight in which Pete complains of jury findings on Bud's other theories of recovery. *See* TEX. R. APP. P. 47.1; *Hatfield v. Solomon*, 316 S.W.3d 50, 59 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (op. on reh'g) (held that if a party receives favorable findings on two or more theories of recovery that are consistent with each other and result in the same damages, trial court may render judgment awarding a single recovery of these damages and the judgment may be based on all of these theories). We note that Pete did not complain of the jury's answers to Questions 12 and 13 by which the jury awarded Bud $1,000 in additional damages for civil theft and $50,000 in exemplary damages for civil theft.

ed question to the jury, we may not reverse unless the error is harmful. *Id.* Harm occurs when the error in the charge probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a); *Ins. Alliance*, 452 S.W.3d at 76. To determine whether harm occurred, we must consider the entire record, including the pleadings, the evidence, and the charge. *Heritage Gulf Coast Props., Ltd. v. Sandalwood Apartments, Inc.*, 416 S.W.3d 642, 655 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

## Analysis

### *Standing*

 Bud and Betty executed separate POAs on March 14, 2011, both naming Pete as their attorney-in-fact. They each signed a second POA on December 5, 2012, again appointing Pete to act as their agent. Persons holding a power of attorney owe fiduciary duties to the transferor of that power. *Plummer v. Est. of Plummer*, 51 S.W.3d 840, 842 (Tex. App.—Texarkana 2001, pet. denied). As his attorney-in-fact, Pete was responsible for informing Bud of actions taken under the POA, maintaining records, and providing an accounting. *See* TEX. EST. CODE ANN. §§ 751.101-.104 (West 2014). The January 8, 2013 POA appointing Mike and Liza as Bud's agents specifically revoked all POAs previously signed by Bud. Therefore, if the January 2013 POA is valid, its execution relieved Pete of his duties. If it was not valid, Pete remained Bud's agent.

In his petition, Pete asserted that, at times when Bud and Betty "lacked sufficient mind and memory or had weakened mind and memory," Mike and Liza secured execution of powers of attorney by undue influence. He further asserted that by such acts the appointment of Pete as POA for Bud and Betty was purportedly revoked. Pete asked the trial court to declare the

execution of the January 2013 POAs void and declare the prior POA to Pete valid. Again, if Pete's allegation was correct, he remained Bud's agent. Pete had a personal stake in the controversy and the declaration sought would resolve the controversy. *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163-64 (Tex. 2004) (held that a declaratory judgment requires a justiciable controversy as to the rights and status of parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy); *Brown*, 53 S.W.3d at 305. Accordingly, Pete had standing to complain about the validity of the January 2013 POAs.

### *Requested Question on POAs*

In his petition, Pete alleged that Liza and Mike, at times when Bud and Betty

> lacked sufficient mind and memory or had weakened mind and memory to understand the nature and consequences of their acts and the business they were transacting, and/or negligently, by misrepresentation as to purpose, need and content, and/or defamation of [Pete], by undue influence, and by breach of fiduciary duty owed to [Bud] and [Betty], secured execution of powers of attorneys....

Mike testified that Bud executed the January 2013 POA of his own free will and claimed that it was Bud's idea. He said Bud requested the change from Pete to Mike and Liza. He stated that he had no reason to believe Bud did not have the required mental capacity to execute legal documents in January 2013. Mike explained that, despite mild dementia, Bud could understand what the POA was. He denied that he and Liza unduly influenced Bud, fraudulently convinced him to sign, acted for their own benefit, or engaged in self-dealing. He testified that Betty was

not able to handle her financial affairs after 2011.

Liza testified that Bud executed the 2013 POA of his own free will and knew exactly what he was doing. She stated that there was nothing out of the ordinary about his behavior or mental state on January 8, 2013, and she has never seen him have an insane delusion. She described Bud as "pretty sharp" and said he was "geared up" to get the issues resolved. She stated that Bud wanted her and Mike to handle things and denied unduly influencing Bud to sign the POA. She specifically denied telling Bud anything untrue about Pete to induce him to sign the POA. She said there was no reason to believe her parents lacked mental capacity to execute legal documents. However, Liza sent an email to her niece on January 11, 2013 saying her parents had severe dementia. In her deposition, she said Betty could not handle her financial affairs for the last year before her June 2013 death.

Bud testified that he removed Pete as his agent because Pete was spending Bud's money on himself. He signed the January 2013 POA appointing Mike and Liza to take care of his financial needs, as well as the January 2013 trust, because they were the only ones he trusted. He denied the accusation that Mike and Liza told him bad stories about Pete to get him to change his POA. He testified that he did not trust Pete because Pete had stolen from him. Bud stated that Mike and Liza did not force him to sign the trust.

Pete testified that, in January 2013, he did not suspect that his parents were incompetent, but, in hindsight, he believes they were not competent at that time. He admitted that he has no specific evidence of undue influence by Mike and Liza. He stated that Bud would not do anything without Mike's approval. Pete stated he did not know of any undue influence in

December 2012, but later heard Bud make remarks that Pete first read in a disparaging email sent by Mike on January 8, 2013. Pete explained that it was Bud's reaction to the undue influence that caused Pete to question Bud's competence. Pete testified that the trust was executed because of Mike and Liza's undue influence. He specifically testified that Bud was subject to undue influence on January 8, 2013 and January 25, 2013, and Bud was told falsities about Pete at the time. Pete opined that the trust is void due to undue influence.

Paul testified that, in January 2013, Bud had diminished mental capacity but he did not know if Bud was mentally incompetent to execute a POA. At trial, Paul did not think Betty was competent in January 2013, but it was not a concern then. Paul thinks Bud was being subjected to undue influence and being told false information about Pete by Mike. He thought Mike was persuading Bud to think that Pete is terrible. He explained that Bud and Mike made some of the same comments about Pete and that Bud thought Pete was evil. Paul stated that he is sure that the combination of Bud's diminished capacity, the undue influence exerted on him, and the false statements about Pete caused Bud to sign the documents in January 2013. Paul further explained that he did not hear Mike or Liza communicate negatively about Pete to Bud and Betty but believed they did because the words and phrases he heard from them in December 2012 were repeated by Bud in January 2013. He stated that Mike and Liza kept the 2013 POA a secret for a week after it was executed.

Bud's physician, Dr. Angelo Vu, testified that a person with moderate dementia is more subject to suggestion either by repetition or undue influence. He stated that Bud had been on a medication used to treat mild to moderate dementia and he

prescribed a medication used to treat moderate to severe dementia. He saw Bud six to eight times, including visits in June 2012 and July 2013. He did not see Bud in January 2013. Throughout the time period he treated Bud, his diagnosis has been mild dementia. Vu testified that Bud was mentally competent to execute legal documents on January 8, 2013 and January 25, 2013.

 Pete requested the following question be included in the jury charge:

Were the Powers of Attorney executed by Edwin N. Healey and/or Betty Healey to Elizabeth Healey and/or Michael R. Healey as a result of undue influence and/or lack of mental capacity and or fraud?

Answer "Yes" or "No" as to each

Answer: Edwin N. Healey _____

Answer: Betty Healey _____

The question was accompanied by instructions explaining what it means to lack sufficient mental capacity to create a power of attorney, defining undue influence, listing the elements of fraud, and explaining what misrepresentation means. The court declined to include the question and its instructions in the charge.

The issue addressed in the requested question is included in Pete's petition. Several witnesses testified about whether Bud and Betty were incapacitated, whether they were subjected to undue influence by Mike and Liza, and whether Mike and Liza defamed Pete to obtain their parents' signatures on documents executed in January 2013. Therefore, the requested question was raised by some evidence. We assume without deciding that the trial court abused its discretion in refusing to submit the requested question. *See* TEX. R. CIV. P. 278. However, we cannot conclude that the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1).

In Question 22, the jury was asked if the trust executed by Bud and Betty was a result of undue influence and/or diminished mental capacity and/or fraud. The charge includes instructions identical to the requested but declined instructions except that the declined instructions referenced the POA and the instructions accompanying Question 22 refer to the trust. The POA was executed on January 8, 2013 and the trust document was executed January 25, 2013. The above recited evidence regarding Bud's and Betty's mental capacity, undue influence by Mike and Liza, and defamation of Pete by Mike and Liza is applicable to both Question 22 and Pete's requested question regarding the POA. The jury answered no to Question 22 rejecting Pete's contention that undue influence, diminished capacity, or fraud played a part in execution of the trust by Bud and Betty. Therefore, any error in failing to submit a question regarding diminished capacity, undue influence, or fraud as it pertains to the POA is harmless. *See Ins. Alliance*, 452 S.W.3d at 76-77 (held that any error in refusing requested questions on fraud and negligent misrepresentation did not probably cause the rendition of an improper judgment where charge as a whole shows that jury did not find that party made any misrepresentations); *Heritage Gulf Coast Props., Ltd.*, 416 S.W.3d at 655-56 (held any error in failing to submit a question was harmless where it was based on actions presented to and rejected by the jury); *Flying J Inc. v. Meda, Inc.*, 373 S.W.3d 680, 688-90 (Tex. App.—San Antonio 2012, no pet.) (recognizing jury's answer to one question may render harmless trial court's error in refusing to submit another question). We overrule Pete's ninth issue.

## First Request for Trial Amendment-POAs

In his tenth issue, Pete contends that the trial court erred in failing to grant Pete's first motion for trial amendment by which he sought to supplement his pleadings to include an additional theory attacking the validity of the POAs. In the motion, he alleged that he had presented evidence that the January 2013 POAs executed by Bud and Betty were not intended to be effective at the time they were signed. He further complains of the trial court's refusal to submit a jury question on this theory to invalidate the POAs.

A court may not refuse a trial amendment unless the opposing party presents evidence of surprise or prejudice, or the amendment asserts a new cause of action or defense, and thus is prejudicial on its face. *Kilpatrick*, 874 S.W.2d at 658. If the trial amendment is not mandatory, the decision to permit or deny the amendment rests within the sound discretion of the trial court. *Id.*

Mike testified on cross-examination that they hoped they would not need the 2013 POAs but it was "not that it was intended that they not be immediately effective." Mike explained that the family believed Pete had serious problems for which he needed to seek help. They wanted to be in a position to take over if Pete did not get help. Therefore, the POAs were meant to become effective only if Pete "failed to do right."

Liza testified on cross-examination that the siblings knew they were going to have the POAs signed in the hopes they would not have to use them because Pete would come around. She then stated that they intended the POAs to be immediately effective, and they were immediately effective.

This testimony was presented on the second day of the trial. The court considered Pete's motion while the jurors were at lunch on the last day of the trial, eight days later. The court denied it without hearing from the parties and without explanation. Assuming without deciding that the trial court's refusal to allow the trial amendment was an abuse of discretion, we ·conclude that any error was harmless. The requested jury question accompanying the trial amendment asked the jury if the January 2013 POAs were intended to be effective when signed.

The POAs signed by Bud and Betty included the explicit statement that "[t]his Power of Attorney shall become effective immediately...." The trial court errs when it does not construe an unambiguous provision as a matter of law, and instead, submits the issue to a fact finder. *Grohman*, 318 S.W.3d at 887; *Transcon. Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). Because the POAs unambiguously stated they became effective immediately, it would have been error for the trial court to submit the proposed question on this alternative theory attacking the validity of the POA. We overrule Pete's tenth issue.

## Disposition

Because Pete has raised no harmful error, we ***affirm*** the trial court's judgment.